**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Alexander GONZALEZ, Defendant–**
**Appellant.**

**No. 01–30059.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 18, 2001.

Filed Aug. 15, 2002.

Carlton F. Gunn, Federal Public Defender, Tacoma, WA, for the appellant.

Helen J. Brunner, Assistant United States Attorney, Seattle, WA, for the appellee.

Before: KLEINFELD and GOULD, Circuit Judges, and ROLL,[1] District Judge.

KLEINFELD, Circuit Judge:

This case turns on the legality of a government search of a government employee's backpack as he left an Air Force base exchange.

## Facts

Appellant Gonzalez worked at the McChord Air Force Base Exchange. As he left work one day, a store detective asked him to let her look in his backpack. The government concedes in its brief that for purposes of this appeal her actions "are those of a government employee." Mr. Gonzalez concedes in his brief that he understood "that employees were required to allow such searches," because he had signed something when he started work so indicating. The store detective had no individualized suspicion that Mr. Gonzalez was stealing anything. This was a random backpack check.

The store detective found four packages of spark plugs in the backpack, worth $3.75 per package.[2] She asked him if he had a receipt, and he told her he'd bought them elsewhere and did indeed have one. She told him she would hold the spark plugs until he came back with his receipt. He presented one that she ascertained did not show a legitimate purchase of the spark plugs.

Mr. Gonzalez pleaded guilty to larceny,[3] reserving for appeal the district court's denial of his motion to suppress the evidence arising from the search of his backpack.

## Analysis

### I. The Fugitive Disentitlement Doctrine

Gonzalez was sentenced September 20, 2000, to 60 days probation with the conditions that he perform sixteen hours of community service and report to the probation officer within the first five days of each month. On November 7, the probation officer said he hadn't reported to her or shown up at the "Food Service Mission Mart" to perform his community service as her office had directed. She said she'd gone to Gonzalez's address on a Friday. She spoke with the apartment manager, who recognized Gonzalez's picture and said she saw him every day at the apartment, which was leased to a woman Gonzalez lived with named Annette Lee. The probation officer went to the apartment but found only Ms. Lee's daughter, and not Mr. Gonzalez. The probation officer told Ms. Lee's daughter that Mr. Gonzalez should report to Probation by Monday at 5:00 P.M. or she'd request a warrant for his arrest. He didn't contact her, and on

---

1. The Honorable John M. Roll, United States District Judge for the District of Arizona, sitting by designation.

2. We share the reader's dismay that this constitutional question should be posed, and that Mr. Gonzalez should have imposed criminal consequences upon himself, over $15 worth of spark plugs.

3. 18 U.S.C. § 641.

Wednesday, November 7, she filed her violation report and warrant request.

Mr. Gonzalez was arrested the following August. The record does not indicate that there was any difficulty finding him or that any attempts had been made since November to locate or arrest him. He was still in Tacoma, Washington, though at a different address from where he lived when he was originally sentenced. The district court revoked his probation and sentenced him to 24 hours of imprisonment.

 The United States argues that Gonzalez's appeal should be dismissed under the doctrine of fugitive disentitlement. Under this doctrine, dismissal of an appeal is "an appropriate sanction when a prisoner is a fugitive during the 'ongoing appellate process.' "[4] The doctrine is equitable, not jurisdictional.[5] Its purpose is to avoid making decisions that could not be enforced, to deter flight, to assure an effective adversary process, and to serve the interest in " 'efficient, dignified appellate practice.' "[6] Because it is an equitable doctrine, application is discretionary.[7] In *United States v. Van Cauwenberghe*,[8] we held that although the appellant had violated the conditions of his probation and left the United States, nevertheless in the peculiar circumstances of that case the purposes of the doctrine did not apply so the appeal would not be dismissed.[9]

██ The record does not establish that Gonzalez was ever a fugitive at all, just that he didn't comply with his conditions of probation. The United States has not suggested that he is in any way a fugitive now. The purposes of the fugitive disentitlement doctrine would not be furthered by applying it here. The doctrine does not apply to an appellant just because he has not reported as directed to the probation office, in the absence of a showing that he has fled or hidden himself from the jurisdiction of the court.

## II. The search

Based on the government's concessions, we treat this case as involving a search by a store detective employed by the government of an employee in a government store. The search was random, not based on individualized suspicion, and was to deter and apprehend theft by employees. These random searches were conducted pursuant to an established policy of the store, and the policy was known to Mr. Gonzalez when he commenced working at the store and when he allowed the search of his backpack.

Appellant first argues, citing cases from several circuits to this effect,[10] that Mr. Gonzalez's consent to the search of his backpack doesn't avoid Fourth Amend-

---

**4.** *Ortega–Rodriguez v. United States*, 507 U.S. 234, 242, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993).

**5.** *United States v. Van Cauwenberghe*, 934 F.2d 1048, 1054 (9th Cir.1991) (citations omitted).

**6.** *Parretti v. United States*, 143 F.3d 508, 511 (9th Cir.1998) (en banc) (*quoting Ortega–Rodriguez*, 507 U.S. at 242).

**7.** *See, e.g., United States v. Sudthisa–Ard*, 17 F.3d 1205, 1206 (9thCir.1994); *Van Cauwenberghe*, 934 F.2d at 1055.

**8.** 934 F.2d 1048 (9th Cir.1991).

**9.** *Id.* at 1055.

**10.** *Railway Labor Executives' Ass'n v. Burnley*, 839 F.2d 575, 589 (9th Cir.1988), *rev'd on other grounds sub nom. Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *Lovvorn v. City of Chattanooga, Tenn.*, 846 F.2d 1539 (6th Cir.1988), *rev'd on other grounds sub nom. Penny v. Kennedy*, 915 F.2d 1065 (6th Cir. 1990) (en banc); *National Fed'n of Fed. Employees v. Weinberger*, 818 F.2d 935, 943 (D.C.Cir.1987); *McDonell v. Hunter*, 809 F.2d 1302, 1310 (8th Cir.1987).

ment protection, because "a search otherwise unreasonable cannot be redeemed by a public employer's exaction of a 'consent' to the search as a condition of employment,"[11] and that his submission to the search when the store detective accosted him was not voluntary, but pursuant to his understanding that he had no choice. We do not reach the issue of whether Mr. Gonzalez consented to the search, or whether there was anything defective about his consent. The parties agree that Mr. Gonzalez signed or initialed some sort of paper when he started work that indicated his understanding that belongings such as his backpack might be inspected, but the government did not submit the paper as evidence, so we don't know what it says. Nor did the government submit any evidence of who said what when the store detective proposed to search Mr. Gonzalez's backpack. The suppression hearing was nothing but argument—no testimony, no exhibits.

Nevertheless, Mr. Gonzalez concedes that he signed or initialed some such paper when he commenced work at the base exchange, that he knew such random searches were store policy, and that he allowed the search of the backpack because and only because he felt he had no choice. Such a paper and such a practice, whether they establish consent or not, "do[ ] put employees on notice that they may be required to submit" to such searches.[12]

Gonzalez next argues that for a search such as this to satisfy the Fourth Amendment, there has to be some individualized suspicion or a more compelling government interest. Here there was no individualized suspicion, and the government interest for which the search was instituted was merely prevention of employee theft, as opposed to preserving human life and safety or national security.

Oddly, neither Gonzalez nor the government cites any authority in point on government employer random theft searches of employees' closed containers, and we have found none. The cases most closely in point appear to be the Supreme Court's decisions in *New Jersey v. T.L.O.*[13] and *O'Connor v. Ortega*[14] and our decision in *United States v. Bulacan.*[15]

*T.L.O.* involves a search of a schoolchild's purse. The Court rejected the proposition that such a search required probable cause and concluded that legality depended "simply on the reasonableness, under all the circumstances, of the search."[16] Reasonableness was to be determined by evaluating whether the "action was justified at its inception"[17] and whether the "search as actually conducted was reasonably related in scope to the circumstances which justified the interference."[18] Though it was a school search,

11. *Weinberger,* 818 F.2d at 943 (*quoting Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (citation omitted)).

12. *Burnley,* 839 F.2d at 589; *see also United States v. Bunkers,* 521 F.2d 1217, 1220 (9th Cir.1975) (upholding search of postal worker's locker where postal employer's well-publicized regulations informed employees that their lockers were subject to search to combat problem of employee theft).

13. 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

14. 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

15. 156 F.3d 963 (9th Cir.1998).

16. *T.L.O.,* 469 U.S. at 341.

17. *Id.* (internal quotation marks and citation omitted).

18. *Id.* (internal quotation marks and citation omitted).

T.L.O. is not limited to the context of schools, because the Court expressly holds that "school officials act as representatives of the State, not merely as surrogates for the parents," [19] so they are subject to the Fourth Amendment.

Unlike *T.L.O.*, which is a majority decision, the Supreme Court's decision in *O'Connor* is a plurality decision, and it is difficult to identify "that position taken by those Members who concurred in the judgments on the narrowest grounds." [20] Also, it involved an office search, and the Court expressly noted that "[t]he appropriate standard for a workplace search does not necessarily apply to a piece of closed personal luggage, a handbag or a briefcase that happens to be within the employer's business address." [21]

Nevertheless, some propositions in *O'Connor* appear to be shared among all the concurring justices. First, "[i]ndividuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer." [22] Second, government employees' expectations of privacy at the workplace may be "reduced by virtue of actual office practices and procedures." [23] Both the plurality and the concurring justice agreed that a search warrant was not needed and that probable cause was not needed, at least where the employer used its access to the employee's office, desks and file cabinets (all that was at issue) "to retrieve workre-

lated materials." [24] The plurality opined that *T.L.O.* applied, so reasonableness rather than probable cause was the standard, balancing the "employees' legitimate expectations of privacy against the government's need for supervision, control, and the efficient operation of the workplace." [25]

In our subsequent decision in *Ortega v. O'Connor*,[26] after remand and trial, we read the Supreme Court's decision in *O'Connor* to hold (1) that government employers don't need search warrants and don't have to have probable cause to search an employee's office for work-related reasons,[27] (2) that such a search doesn't violate the Fourth Amendment if it is "reasonable under the circumstances," [28] and (3) that the search must be "justified at its inception and ... reasonably related in scope to the circumstances that justified it." [29]

One other precedent has some bearing on this case, although, like *T.L.O.* and *O'Connor*, it is distinguishable. In *Bulacan*, the search was of a woman's handbag as she came into a government building.[30] The search was for security threats to those in the building, not for things stolen from the building. The security officers didn't find bombs or weapons, but did find methamphetamine. We held that this type of search was "administrative," exempt from the probable cause requirement but controlled by "the Fourth Amendment's standard of reasonableness," which re-

19. *Id.* at 336.

20. *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (internal quotation marks and citation omitted).

21. *O'Connor,* 480 U.S. at 716.

22. *Id.* at 717; *accord id.* at 730–31 (Scalia, J. concurring).

23. *Id.* at 717; *accord id.* at 731 (Scalia, J. concurring).

24. *Id.* at 732 (Scalia, J. concurring); *accord id.* at 725–26 (O'Connor, J.).

25. *Id.* at 719–20.

26. 146 F.3d 1149 (9th Cir.1998).

27. *Id.* at 1159.

28. *Id.* at 1158.

29. *Id.* (citations omitted).

30. 156 F.3d at 966.

quires the court to "balance the need to search against the invasion which the search entails."[31] The intrusion has to be limited to what is consistent with the administrative need that justifies it, which is another way of saying what *T.L.O.* and *O'Connor* say, that the search must be "justified at its inception and ... reasonably related in scope to the circumstances that justified it."[32] In *Bulacan,* the justification for the search was protection of the people in the building from explosives and weapons, so the express purpose of also looking for narcotics fell outside the permitted relationship between the scope of the search and the scope of the circumstances that justified it.

■■■■■ Applying these principles to this case, we start with the proposition that the base exchange search of Mr. Gonzalez's backpack was constrained by the Fourth Amendment. The store detective did not need probable cause to believe that Mr. Gonzalez was stealing, but the search still had to conform to the test of reasonableness articulated by the Supreme Court in *T.L.O.* Mr. Gonzalez's expectation of privacy was limited by his knowledge of the store policy of searching employees' belongings to deter and apprehend theft. His reduced expectation is not the end of the inquiry, however, because at some point the circularity of reduced expectations of privacy can destroy any privacy at all.

The first prong of the *T.L.O.* test is whether the search was justified at its inception.[33] Here the search was of employees' closed containers such as backpacks to apprehend and deter theft. Pre-vention of theft is a legitimate justification for a search. It's hard to run a store if the employees walk out with the inventory. Though not as important as assuring that pilots and railroad engineers aren't drunk, or that visitors to government buildings aren't bringing in bombs and machine guns, it's at least as important as assuring that high school students aren't smoking cigarettes in the bathroom, which was the justification for searching the schoolgirl's purse in *T.L.O.*

The second prong of the *T.L.O.* test is whether the "search as actually conducted was reasonably related in scope to the circumstances which justified the interference."[34] There was no evidence to the contrary (there was no evidence at all—neither lawyer offered any). In the absence of evidence that the search went beyond the scope of its justification, there is no particular reason to think that the search of Mr. Gonzalez's backpack went beyond what was reasonable to look for stolen inventory.

Though he was at his workplace, Mr. Gonzalez was entitled to have a private life, and to have items of his private life in his backpack without having them examined by prying eyes beyond what was appropriate to determine whether he was walking out with stolen merchandise. Sometimes people carry personal things to work that ought not to be revealed, as when they have family matters to attend to on the way to work or home or during the lunch hour, physicians' appointments during the workday, reading material for the bus or subway, papers relating to other

---

**31.** *Id.* at 967 (citation omitted).

**32.** *Ortega,* 146 F.3d at 1158 (citations omitted).

**33.** *T.L.O.,* 469 U.S. at 341–42 (internal quotation marks and citation omitted); *see also Ortega,* 146 F.3d at 1158 (citations omitted).

**34.** *T.L.O.,* 469 U.S. at 341 (internal quotation marks and citation omitted); *see also Ortega,* 146 F.3d at 1158 (citations omitted).

existing or prospective employment, and so forth.

The store was entitled to search his backpack for stolen merchandise, even though the search was on a random basis without reasonable suspicion, but only because he had clear notice before he ever came to work with his backpack that he would be subject to just such a search, and the search did not go beyond the scope appropriate to looking for stolen merchandise. An employee on his first day who had not yet signed or learned of the store policy, let alone a customer who neither knew of nor consented to any policy of random searches, might be in a much stronger position to have a reasonable expectation of privacy deserving protection from such searches, but Mr. Gonzalez did not. And a store detective who exceeded the scope of a search conducted pursuant to a policy to prevent theft, for example by reading an employee's papers, might well have violated the Fourth Amendment's scope requirement. But there is no evidence that the search exceeded the appropriate scope in Mr. Gonzalez's case.

■ In sum, we understand the law to be that no probable cause is needed for such an employee search, but reasonableness is required. A court must consider the strength of the employee's reasonable expectation of privacy, the justification for the government employer's search, and the scope of the search as it relates to the justification for the search, in order to determine whether the search is reasonable. This search was reasonable.

AFFIRMED.