TASHIMA, Circuit Judge.
Plaintiffs-Appellants in this class action (“Appellants”), San Diego County welfax-e recipients, appeal from the district court’s grant of summary judgment in favor of defendants, County of San Diego and various county officials (collectively, “San Diego County” or the “County”). Appellants coxxtend that the district court erred in concluding that the County’s welfare eligibility program (“Project 100%”), which requires all welfare applicants to consent to a warrantless home visit as a condition of eligibility, does not violate them lights under the United States Constitution, the California Constitution, or California welfare regulations prohibiting mass and indiscriminate home visits. Our jurisdiction is pursuant to 28 U.S.C. § 1291. We hold that San Diego County’s Project 100% does not violate the United States Constitution, the California Constitution, or California welfare regulations. We therefore affirm the district court.
BACKGROUND
In 1997, the San Diego County District Attorney (“D.A.”) initiated a program whereby all San Diego County residents who submit welfare applications under Califorxxia’s welfare program (“Cal-WORKS”), and ax-e not suspected of fraud or ineligibility, are automatically enrolled in Project 100%. The parties are esseix-tially in agreement as to the structure and operation of Project 100%. Under Project 100%, all applicants receive a home visit from an investigator employed by the D.A.’s office. The visit includes a “walk through” to gather eligibility infox'mation that is then turned over to eligibility technicians who compare that information with information supplied by the applicant. *919 Specifically, the investigator views items confirming that: (1) the applicant has the amount of assets claimed; (2) the applicant has an eligible dependent child; (3) the applicant lives in California; and (4) an “absent” parent does not live in the residence.
When applicants submit an application for welfare benefits, they are informed that they will be subject to a mandatory home visit in order to verify their eligibility. Applicants are also informed that the home visit must be completed prior to aid being granted, but are not given notice of the exact date and time the visit will occur. The visits are generally made within 10 days of receipt of the application and during regular business hours, unless a different time is required to accommodate an applicant’s schedule. The home visits are conducted by investigators from the Public Assistance Fraud Division of the D.A.’s office, who are sworn peace officers with badges and photo identification. The investigators wear plain clothes and do not carry weapons.
The actual home visit consists of two parts: an interview with the applicant regarding information submitted during the intake process, and a “walk through” of the home. The visit takes anywhere from 15 minutes to an hour, with five to 10 minutes generally allocated to the “walk through.” If the applicant refuses to allow a home visit, the investigator immediately terminates the visit and reports that the applicant failed to cooperate. This generally results in the denial of benefits.[1] The denial of welfare aid is the only consequence of refusing to allow the home visit; no criminal or other sanctions are imposed for refusing consent.
The “walk through” portion of the home visit is also conducted with the applicant’s consent. The applicant is asked to lead the “walk through” and the investigator is trained to look for items in plain view. The investigator will also ask the applicant to view the interior of closets and cabinets, but will only do so with the applicant’s express permission.[2] While the investigators are required to report evidence of potential criminal wrongdoing for further investigation and prosecution, there is no evidence that any criminal prosecutions for welfare fraud have stemmed from inconsistencies uncovered during a Project 100% home visit.[3]
Appellants challenge the lawfulness of *920 Project 100%.[4] The parties filed cross-motions for summary judgment on all claims. The district court first granted summary judgment to the County on most theories and claims for relief. It later granted summary judgment to Appellants on certain California state-law claims, enjoining the County from committing further violations of those provisions. The remaining claims, concerning violations of food-stamp regulations, were resolved by a stipulated settlement which was approved by the district court. After final judgment was entered, Appellants timely appealed the district court’s decision on their claims arising under the Fourth Amendment of the United States Constitution, the California Constitution, and California welfare regulations prohibiting mass and indiscriminate home visits.
STANDARD OF REVIEW
Whether summary judgment was properly granted presents a question of law, to be reviewed de novo. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc). In conducting such review, “[w]e must ... determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.” Suzuki Motor Corp. v. Consumers Union of U.S., Inc., 330 F.3d 1110, 1131-32 (9th Cir.2003) (citing Devereaux v. Abbey, 263 F.3d 1070, 1074 (9th Cir.2001) (en banc)).
DISCUSSION
I
Fourth Amendment Claim
The Fourth Amendment to the United States Constitution protects the “right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. Const, amend. IV. Appellants argue that the warrantless home visits conducted under Project 100% violate the Fourth Amendment’s protection against unreasonable searches as it applies to the State of California via the Fourteenth Amendment.
A. The Home Visits are Not Searches under the Fourth Amendment
We must first decide the threshold question of whether the home visits qualify as searches within the meaning of the Fourth Amendment. Appellants contend that the home visits are searches because they are highly intrusive and their purpose is to discover evidence of welfare fraud. The Supreme Court, however, has held that home visits for welfare verification purposes are not searches under the Fourth Amendment. See Wyman v. *921 James, 400 U.S. 309, 317-18, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971).
In Wyman, the Court held that home visits by a social worker, made pursuant to the administration of New York’s welfare program, were not searches because they were made for the purpose of verifying eligibility for benefits, and not as part of a criminal investigation. Id. While the Court’s reasoning was brief, the opinion noted that the visits were “not forced or compelled, and that the beneficiary’s denial of permission [was] not a criminal act.” Id. The Court also reasoned that the visits were not searches because the beneficiary could choose to withhold consent and there would be “no entry of the home and ... no search.” Id. While the Court acknowledged that the nature of the visit was “both rehabilitative and investigative,” importantly, the visits were not conducted as part of a criminal investigation. Accordingly, the Court concluded that the visits did not rise to the level of a “search in the traditional criminal law context.” Id.[5]
Wyman directly controls the instant case.[6] Here, as in Wyman, all prospective welfare beneficiaries are subject to mandatory home visits for the purpose of verifying eligibility, and not as part of a criminal investigation. The investigators conduct an in-home interview and “walk through,” looking for inconsistencies between the prospective beneficiary’s application and her actual living conditions. As in Wyman, the home visits are conducted with the applicant’s consent, and if consent is denied, the visit will not occur. Also as in Wyman, there is no penalty for refusing to consent to the home visit, other than denial of benefits.[7] Id. at 325, 91 S.Ct. 381. The fact that the D.A. investigators *922 who make the Project 100% home visits are sworn peace officers does not cause the home visits to rise to the level of a “search in the traditional criminal law context” because the visits’ underlying purpose remains the determination of welfare eligibility. See id. at 317, 91 S.Ct. 381; see also New York v. Burger, 482 U.S. 691, 717, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (“[W]e fail to see any constitutional significance in the fact that police officers, rather than ‘administrative’ agents, are permitted to conduct the [ ] inspection.”).[8]
Therefore, because we are bound by Wyman, we conclude that the Project 100% home visits do not qualify as *923 searches within the meaning of the Fourth Amendment.
B. Even if the Home Visits are Searches, they are Reasonable
“[W]hether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests.” Vernonia Sch. Dist., 515 U.S. at 652-53, 115 S.Ct. 2386 (internal quotation marks omitted). The district court found that the Project 100% home visits, even if considered searches, were reasonable under Wyman. Although we need not reach the question to decide Appellants’ Fourth Amendment challenge, because the home visits do not constitute searches under Wyman, we agree with the district court that even if the home visits are searches under the Fourth Amendment, they are reasonable.[9]
1. Wyman v. James
In Wyman, the Court concluded that the home visits, even if considered a search, were valid under the Fourth Amendment “because [they] did not descend to the level of unreasonableness ... which is the Fourth Amendment’s standard.” Wyman, 400 U.S. at 318, 91 S.Ct. 381. The Court weighed several factors in balancing the governmental interest in conducting home visits against the intrusion into the welfare applicant’s privacy. Id. at 318-24, 91 S.Ct. 381. Relevant to this analysis were: (1) the public’s strong interest in the protection of dependent children and ensuring that aid provided from tax revenue reaches its intended and proper recipients; (2) the statute’s focus on assistance and rehabilitation; (3) that the home visit was not a criminal investigation and did not involve police or uniformed authority; (4) the visits’ procedural safeguards, including providing advanced written notice and prohibiting forced entry or “snooping” within the home; and (5) the serious administrative difficulties posed by a warrant requirement in the welfare context. /A[10]
Here, as in Wyman, the home visits serve the important governmental interests of verifying an applicant’s eligibility for welfare benefits and preventing fraud. As the Court acknowledged in Wyman, the public has a strong interest in ensuring that aid provided from tax dollars reaches its proper and intended recipients. Id. at 318, 91 S.Ct. 381. While the visits in this case differ from those in Wyman in that they are conducted by peace officers, this distinction does not transform a Project 100% visit into a “search in the traditional criminal law context.” Id. at 317, 91 S.Ct. *924 381.[11] The investigators are not uniformed officers and will only enter the applicant’s home with consent. Although the investigators will report any evidence of criminal activity for potential prosecution, this is not the underlying purpose of the visit, and no criminal prosecutions for welfare fraud have stemmed from inconsistencies uncovered during a Project 100% home visit since the program’s inception in 1997.[12]
The Project 100% home visits also have many of the same procedural safeguards that the Wyman Court found significant. See Wyman, 400 U.S. at 320-21, 91 S.Ct. 381. Applicants are given notice that they will be subject to a mandatory home visit and visits generally occur only during normal business hours. When the investigators arrive to conduct the visit, they must ask for consent to enter the home. If the applicant does not consent to the visit, or withdraws consent at anytime during the visit, the visit will not begin or will immediately be terminated, as the case may be.[13]
Finally, the Court’s concern that a warrant requirement would pose serious ad *925 ministrative difficulties in the welfare context is also present in this case. Id. at 323-24, 91 S.Ct. 381 (“The warrant procedure, which the plaintiff appears to claim to be so precious to her, even if civil in nature, is not without its seriously objectionable features in the welfare context.”). As the Court in Wyman explained, “if a warrant could be obtained, it presumably could be applied for ex parte, its execution would require no notice, it would justify entry by force, and its hours for execution would not be so limited as those prescribed for home visitation.” Id. This type of warrant requirement would make home visits more intrusive than the County’s current suspicionless home visit program because welfare applicants’ rights and privacy would be subject to greater infringement.
Therefore, because the Project 100% visits serve an important governmental interest, are not criminal investigations, occur with advance notice and the applicant’s consent, and alleviate the serious administrative difficulties associated with welfare eligibility verification, we hold that the home visits are reasonable under the Supreme Court’s decision in Wyman.
2. “Special Needs” Cases
While Wyman provides adequate, independent grounds for holding that the Project 100% home visits are reasonable, the Supreme Court’s Fourth Amendment jurisprudence has evolved significantly since Wyman, providing further support for this conclusion. Subsequent to Wy-man, the Court articulated its “special needs” exception to the warrant requirement, holding that “[a] search unsupported by probable cause can be constitutional ... when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.” Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (internal quotation marks omitted). The Court’s “special needs” analysis involves two steps: (1) determining whether the government has articulated a valid “special need;” and, (2) analyzing whether the proposed administrative search is justified in light of that articulated “special need.” United States v. Scott, 450 F.3d 863, 869-72 (9th Cir.2006).

a. The County’s administration of its welfare system is a “special need”

In Griffin, the Supreme Court examined whether the State’s operation of its probation system was a “special need” that justified the warrantless search of a probationer’s home, based on reasonable grounds to suspect the presence of contraband. Griffin, 483 U.S. at 872, 107 S.Ct. 3164. The Court held that the operation of a probation system was a valid “special need,” explaining that the system worked towards genuine rehabilitation through intensive supervision and that a “warrant requirement would interfere to an appreciable degree.” Id. at 873-76, 107 S.Ct. 3164.
More recently, in Earls, the Court reaffirmed its “special needs” reasoning, holding that a public school’s policy of requiring suspicionless drug testing for student athletes was justified in light of the *926 school’s “special need” to prevent and deter drug use among its students. Earls, 586 U.S. at 838, 122 S.Ct. 2559. The Court emphasized that the searches were not conducted for law enforcement purposes, and explained that the “special need” justified the intrusion on the student’s privacy without individualized suspicion. Id. at 829, 122 S.Ct. 2559.
In Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), however, the Court held that a public hospital’s policy of identifying and testing mothers whose children tested positive for drugs at birth was not justified under the “special needs” doctrine because “the immediate objective of the searches was to generate evidence for law enforcement purposes.” Id. at 83, 121 S.Ct. 1281 (emphasis in the original). The Court explained that the “central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment,” and concluded that “the purpose actually served by the [] searches is ultimately indistinguishable from the general interest in crime control.” Id. at 81, 121 S.Ct. 1281 (internal quotation marks omitted).
Ferguson turned on the fact that the searches at issue were conducted for general law enforcement purposes. See id. The Court emphasized that while the drug testing program partially served a noncriminal purpose, the program’s efficacy was ultimately tied to the successful prosecution of mothers whose children tested positive for drugs. Id. at 82-84, 121 S.Ct. 1281. In Wyman, however, the Court specifically noted that home visits in the welfare context primarily serve the administrative function of eligibility verification, which is not a general law enforcement purpose. Wyman, 400 U.S. at 326, 91 S.Ct. 381. As discussed supra, the primary purpose of the Project 100% home visits is to verify eligibility for welfare benefits. While there may be a fine line between verifying eligibility and investigating fraud, the record here supports that the visits are indeed used primarily for verification and prevention purposes. Since the program’s inception in 1997, not a single criminal prosecution for welfare fraud has resulted from inconsistencies uncovered during a Project 100% home visit. While investigators are required to report evidence of criminal violations for potential prosecution, this does not make the home visits criminal investigations. See Wyman, 400 U.S. at 317, 91 S.Ct. 381. Moreover, unlike in Ferguson, 532 U.S. at 82-84, 121 S.Ct. 1281, Project 100%’s efficacy is not dependent upon the prosecution of suspected welfare fraud cases.
Therefore, because the underlying purpose of the home visits is to verify eligibility for welfare benefits, and not for general law enforcement purposes, we conclude that San Diego County has articulated a valid “special need.”

b. Project 100% is reasonable in light of the County’s “special need”

Because we conclude that the administration of the County’s welfare system presents a “special need” beyond those of normal law enforcement, we must now determine whether this need is “important enough to override the individual’s acknowledged privacy interest [and] sufficiently vital to suppress the Fourth Amendment’s normal requirement of individualized suspicion.” Chandler v. Miller, 520 U.S. 305, 318, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). “[W]hether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests.” Vernonia, 515 *927 U.S. at 652-53, 115 S.Ct. 2386 (internal quotation marks omitted). Specifically, we consider: (1) the nature of the privacy interest upon which the search intrudes; (2) the character of the intrusion; and (3) the importance of the government interest at stake. See Earls, 536 U.S. at 830-34, 122 S.Ct. 2559; Vernonia, 515 U.S. at 654-61, 115 S.Ct. 2386.
Here, the nature of Appellants’ privacy interest is significant because the government is conducting searches of their homes, a traditionally protected area of personal privacy.[14] As illustrated by Griffin, however, a person’s relationship with the state can reduce that person’s expectation of privacy even within the sanctity of the home. When eligibility depends, in part, upon a person’s physical residence in the state and actual presence at the place designated as their residence, verification of eligibility may be reasonably required in the form of the home visit under review here in order to ensure that funds are properly spent. Moreover, the home visits are conducted with the applicant’s express consent, thus, further reducing the applicant’s expectation of privacy.[15] Therefore, it is reasonable for welfare applicants who desire direct cash governmental aid to undergo eligibility verification through home visits.
Next, we must weigh the character of the intrusion on Appellants’ privacy. Appellants argue that the home visits are virtually unlimited in scope. As discussed above, however, the record demonstrates that the procedures used in conducting the home visits are designed to reduce the intrusion on the applicant’s privacy. Investigators only examine areas of the home that they believe will provide relevant information pertaining to the applicant’s welfare eligibility. If at any point before or during the visit, the applicant refuses to consent, or withdraws consent, the visit ends immediately. Additionally, inspections are completed in a reasonable amount of time and there is no evidence that any of the applicants has been subjected to abusive behavior during the home visits.
Finally, we must analyze the need for the intrusion in light of its efficacy in *928 achieving the governmental interests at stake. Appellants argue that there is no statistically significant evidence that Project 100% has actually reduced welfare fraud. The County, however, produced data showing that, during the five-year period during which Project 100% was implemented, the overall denial rate increased from 40.6% to 47.7%, and there was an additional 4-5% increase in application withdrawals. While it is difficult to measure the precise efficacy of Project 100%, these empirical observations support the logical connection between the home visits and their intended purpose. Moreover, the visits are an effective method of verifying eligibility for benefits, and, at a minimum, the visits provide an important deterrent effect.
Appellants also contend that all necessary information for purposes of verification can be obtained from other sources and that the home visits merely duplicate the intake interviews. The Supreme Court has stressed, however, that the Fourth Amendment does not require that the government use the least intrusive means “because the logic of such elaborate less-restrictive alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.” Earls, 536 U.S. at 837, 122 S.Ct. 2559. More importantly, the Court has already rejected a similar argument in Wyman, explaining that “[ajlthough ... secondary sources might be helpful, they would not always assure verification of actual residence or of actual physical presence in the home, which are requisites for AFDC benefits.... ” Wyman, 400 U.S. at 322, 91 S.Ct. 381.
Accordingly, because the Project 100% home visits are conducted in a reasonable manner, and serve an important administrative purpose, the Supreme Court’s “special needs” line of cases provides further support for our conclusion that the home visits are reasonable under the Fourth Amendment.[16]
II
California Claims
A. Article I § 13 of the California Constitution
Appellants argue that the Project 100% home visits violate their right to be free from unreasonable searches under Article I § 13 of the California Constitution. Appellants rely on People v. Brisendine, 13 Cal.3d 528, 119 Cal.Rptr. 315, 531 P.2d 1099 (1975), superseded on other grounds by In re Lance W., 37 Cal.3d 873, 210 Cal.Rptr. 631, 694 P.2d 744 (1985), for the proposition that California courts interpret Article I § 13 as demanding broader protection than the Fourth Amendment.[17]
The California Supreme Court has made clear, however, that “[t]he touchstone for all issues under the Fourth Amendment and article I, section 13 of the California Constitution is reasonableness.” Ingersoll v. Palmer, 43 Cal.3d 1321, 241 Cal.Rptr. 42, 743 P.2d 1299, 1304 (1987). This language indicates that the right to *929 be free from unreasonable searches under Art. I § 13 of the California Constitution parallels the Fourth Amendment inquiry into the reasonableness of a search. See e.g., Smith v. Los Angeles County Bd. of Supervisors, 104 Cal.App.4th 1104, 128 Cal.Rptr.2d 700 (2002) (applying the Supreme Court’s “special needs” rationale and Wyman to deny a similar challenge to a Los Angeles County welfare eligibility verification program arising under the state and federal constitutions); see also Hill v. Nat’l Collegiate Athletic Ass’n, 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 865 P.2d 633, 650 (1994) (“The ‘privacy’ protected [under state law] is no broader in the area of search and seizure than the ‘privacy’ protected by the Fourth Amendment or by article I, section 13 of the California Constitution.”). Accordingly, for the reasons discussed in Part I.B, supra, even assuming that Project 100% home visits qualify as searches, they are reasonable under the California Constitution.
Appellants nonetheless maintain that the California Supreme Court’s decision in Parrish v. Civil Service Commission, 66 Cal.2d 260, 57 Cal.Rptr. 623, 425 P.2d 223 (1967), demonstrates that the California Constitution provides broader protection than its federal counterpart in the context of this case. Parrish, however, does not purport to expand the protections granted by the California Constitution beyond those granted by the United States Constitution, and instead, explicitly relies on federal law. See id. at 227 (citing Frank v. Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959)).[18] Moreover, Parrish is easily distinguished from the instant case.
In Parrish, the Alameda County welfare department conducted a series of suspi-cionless, unannounced early-morning raids of the homes of the county’s welfare recipients in order to detect the presence of unauthorized males. Id. at 225. The purpose of the raids on recipients not suspected of fraud was to “persuade the public that the incidence of welfare fraud falls below popular estimates.” Id. at 232. The raids were conducted at 6:30 a.m. on a Sunday by a pair of social workers. Id. at 225. The welfare recipient’s social worker would knock on the recipient’s door and request entry. Id. at 225-26. Refusal to consent could serve as a basis for terminating welfare benefits. Id. at 228. If consent was given, the caseworker would immediately proceed to the back door to admit his or her partner, with the pair proceeding to search the entire residence for evidence of welfare fraud. Id. at 226.
The court rejected the County’s argument that the searches were administrative searches that could properly be conducted without probable cause and a warrant. Id. at 226-28. The court reasoned that the searches were very inconvenient to the occupant, were conducted without suspicion of fraud, and were far removed from orderly daytime administrative searches. Id. at 227-28. The court also reasoned that the raids could not be justified by consent because “[t]he request for entry by persons whom the beneficiaries knew to possess virtually unlimited power over their very livelihood ... nullified] the legal effectiveness of the apparent consent.” Id. at 229-30.
*930 Even assuming that Parrish was decided under the California Constitution, and that the California Constitution provides broader protection than the Fourth Amendment, it is nonetheless clearly distinguishable and, thus, inapplicable under the facts of this case. Parrish involved mass raids, conducted without advance warning, on a Sunday morning at 6:30 a.m. Id. at 225-26. The purpose of the raids in Parrish was to demonstrate the efficiency of welfare fraud detection to the public. Id. at 225. On the other hand, the Project 100% home visits are orderly daytime administrative searches conducted to verify welfare eligibility and prevent fraud. The Project 100% investigators provide the welfare applicants advance notice that they will be subject to a home visit and only conduct visits during business hours. As the Parrish court itself noted, there is a “great gulf which separates an ‘orderly’ afternoon visit from the searches conducted shortly after dawn in the present case.” Id. at 228.
We conclude therefore that Parrish provides no support for the hypothesis that Article I § 13 of the California Constitution provides greater protection than the Fourth Amendment in the context of this case. We conclude that the Project 100% home visits are reasonable under Article I § 13 of the California Constitution.
B. Article I § 1 of the California Constitution
Appellants also argue that the Project 100% home visits violate their right to privacy under Article I § 1 of the California Constitution. As the California Supreme Court has recognized, however, in In re York, 9 Cal.4th 1133, 40 Cal.Rptr.2d 308, 892 P.2d 804 (1995), “in the search and seizure context, the article I, section 1, privacy clause of the California Constitution has never been held to establish a broader protection than that provided by the Fourth Amendment of the United States Constitution or article I, section 13 of the California Constitution.” Id. at 813 (citations and internal quotation marks omitted); see also Hill, 26 Cal.Rptr.2d 834, 865 P.2d at 650 n. 9. Therefore, Appellants’ contention that Project 100% violates Article I § 1 of the California Constitution also fails because, as we have held, Project 100% searches are reasonable under the Fourth Amendment and Article 1 § 13 of the California Constitution.
C. Unconstitutional Conditions Doctrine
The California unconstitutional conditions doctrine holds that where the “receipt of a public benefit is conditioned upon the waiver of a constitutional right, the government bears a heavy burden of demonstrating the practical necessity for the limitation.” Robbins v. Superior Court, 38 Cal.3d 199, 211 Cal.Rptr. 398, 695 P.2d 695, 704 (1985) (internal quotation marks omitted). Under the unconstitutional conditions doctrine, the governmental entity seeking to impose such a condition must establish that:
(1) the conditions reasonably relate to the purposes sought by the legislation which confers the benefit;
(2) the value accruing to the public from imposition of those conditions manifestly outweighs any resulting impairment of constitutional rights; and (3) there are no alternative means less subversive of constitutional right, narrowly drawn so as to correlate more closely with the purposes contemplated by conferring the benefit.
Parrish, 425 P.2d at 230-31 (citations omitted).
A plaintiff alleging a violation of the unconstitutional conditions doctrine, however, must first establish that a consti *931 tutional right is infringed upon. Id. Here, Appellants must establish that San Diego County is conditioning the receipt of welfare benefits on the waiver of a constitutional right. Because we have held that the Project 100% home visits are reasonable, the receipt of welfare benefits is not being conditioned upon the waiver of a constitutional right under either the California or federal constitutions because the Fourth Amendment and Article 1 § 13 only create a right to be free from unreasonable government intrusions into the home. See Earls, 536 U.S. at 828, 122 S.Ct. 2559; In re York, 40 Cal.Rptr.2d 308, 892 P.2d at 813.
D. State Regulation Prohibiting “Mass” & “Indiscriminate” Home Visits
Appellants contend that Project 100% violates MPP § 20-007.33, which prohibits “[m]ass or indiscriminate home visits.” Appellants argue that the home visits in this case are both “mass” and “indiscriminate” because they are performed on all applicants for aid and do not discriminate between applicants based on any reasonable suspicion of fraud.
A careful reading of MPP § 20-007 as a whole, however, reveals that the regulation applies only to Special Investigative Units “investigating suspected welfare fraud and suspected violations of the law.” MPP § 20-007.1 (emphasis added). Based on the plain language of the regulation, we conclude that the California Department of Social Services did not intend to apply § 20-007.33 to the home visits at hand because the Project 100% investigators are not conducting for-cause investigations.[19] Moreover, the same argument raised by Appellants in this case was rejected by the California Court of Appeal in Smith, 128 Cal.Rptr.2d at 706, which held that California’s prohibition against “mass or indiscriminate” home visits, “which is contained in the MPP’s voluminous fraud investigation procedures, [did not] limit procedures that are provided elsewhere in the MPP, and specifically in MPP [40-161], for determinations of eligibility for CalWORKS benefits.” Accordingly, we hold that MPP § 20-007.33’s prohibition against “mass or indiscriminate” home visits does not apply to the case at bench.
CONCLUSION
We conclude that the Project 100% home visits are not Fourth Amendment searches under Wyman. Even assuming that they are searches, they are reasonable under Wyman and the Supreme Court’s subsequent “special needs” cases. Because Project 100% searches are reasonable, they do not violate the Fourth Amendment or the California Constitution. Finally, MPP § 20-007.33’s prohibition against “mass and indiscriminate home visits” is inapplicable to Project 100% home visits because § 20-007.33 applies only to for-cause home visits.
Accordingly, the district court’s grant of summary judgment in favor of San Diego County is AFFIRMED.

. Specifically, the D.A. investigator prepares and forwards a report regarding the home interview and visit to a welfare eligibility technician ("ET”). The ET then makes an eligibility determination based upon a review of the applicant’s entire file. If the ET is unable adequately to verify the applicant's eligibility, benefits will be denied. The County has conceded that an applicant’s failure to allow a home visit will generally result in the denial of benefits because the ET is unable adequately to verify the applicant’s eligibility without the information included in the D.A. investigator’s report.

. Appellants make much of the fact that investigators sometimes view the contents of laundry baskets or trash cans. The record, however, shows only one isolated instance of an investigator viewing the contents of a laundry basket, and it was done at the welfare applicant's suggestion.

.The County maintains that no applicant has been prosecuted for welfare fraud based upon anything observed or discovered during a home visit that contradicted information provided by the applicant. The County concedes, however, that if the home visit reveals information that an applicant may have received CalWORKS benefits in the past to which the applicant was not entitled, this information may lead to a subsequent criminal investigation. Moreover, the investigators do make referrals for criminal investigation, for example, if they discover evidence of contraband, child abuse, or a subject with outstanding felony warrants.

. Appellants alleged the following claims in their first amended complaint: (1) unreasonable searches and seizures (U.S. Const. amends. IV and XIV; 42 U.S.C. § 1983; Cal. Const. Art. 1 § 13); (2) deprivation of property without due process (U.S. Const. amend. XIV; 42 U.S.C. § 1983; Cal. Const. Art. 1 § 7); (3) violation of right to privacy (Cal. Const. Art. 1 § 1); (4) unconstitutional condition for receipt of benefits under the California Constitution; (5) unlawful imposition of new eligibility criteria for welfare benefits (7 C.F.R. §§ 273.1 (f)(4)(i), (iii); 45 C.F.R. § 205.100; Cal. Welf. & Inst.Code §§ 10600, 11207, 11209, 11250; California Health & Human Services Manual of Policies & Procedures ("MPP”) §§ 40-161, 63-300.543); (6) unlawful elicitation of unnecessary information (7 C.F.R. § 273.2; Cal. Welf. & Inst.Code § 10500; MPP §§ 40-101.12, 40-126.31); (7) failure to limit fraud investigation referrals (Cal. Welf. & Inst.Code §§ 11055.5(d)(6), 11055.5(d)(7)); (8) unlawful mass and indiscriminate home visits (MPP §§ 20-007.33; 40-161); and (9) violation of confidentiality (7 C.F.R. § 273.2(f)(5)(ii); Cal. Welf. & Inst. Code § 10850; MPP §§ 19-007, 40-101.13, and 40-157.22).

. While no Ninth Circuit case has applied Wyman to analogous facts, the Seventh Circuit did so in S.L. v. Whitburn, 67 F.3d 1299 (7th Cir.1995). The court reviewed a challenge to Milwaukee County’s AFDC verification program, under which county caseworkers would conduct home visits in order to verify the contents of the welfare beneficiary's application. Id. at 1301-02. The court applied Wyman, concluding that there was no search under the Fourth Amendment because caseworkers could only enter applicants’ homes with their consent, refusal to consent was not a criminal act, and the underlying purpose of the visits was not criminal prosecution. Id. at 1307.

. The dissent contends that "Wyman is factually distinguishable” and thus not binding. Dissent at 936. In support of this contention, the dissent relies primarily on its assertion that the Wyman home visits were "primarily rehabilitative,” dissent at 932, and that "the Project 100% home visits have only a minimal, if any, rehabilitative function.” Dissent at 934. There are two problems with this assertion. First, Wyman is based on two alternative holdings. As to its first holding— that the New York home visits were not searches — the only rehabilitative purpose on which the Court relied was its discussion of the federal welfare laws and their purpose of providing “financial assistance and rehabilitation and other services ... to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life...." Wyman, 400 U.S. at 315, 91 S.Ct. 381 (ellipses in the original) (citation and internal quotation marks omitted). The federal welfare laws are the same background against which San Diego County's welfare program is administered. So, on Wyman’s first holding, there is no greater showing of a rehabilitative purpose than there is in this case. Second, and thusly, the dissent’s attempt to distinguish this case from Wyman go only to Wyman’s alternative holding — that even if the home visits are considered to be Fourth Amendment searches, they are reasonable. Thus, the dissent’s assertion that Wyman is not binding is unpersuasive because it does not address Wyman’s primary holding that a welfare verification home visit is not a Fourth Amendment search at all.

.The dissent suggests that Project 100%’s lack of a rehabilitative purpose sufficiently distinguishes this case from Wyman for purposes of determining whether the home visits constitute searches in the traditional criminal law context. See Dissent at 934 - 935. First, *922 as we point out in the immediately preceding footnote, the search in Wyman had no more of a rehabilitative purpose than the search here. Second, and in any event, whether the home visits serve a rehabilitative purpose is not the determinative inquiry under Wyman. As the dissent acknowledges, this factor is relevant only insofar as it indicates that the home visits are not intended as searches conducted in furtherance of a criminal investigation. See Dissent at 936. (“Wyman concluded that New York's home visit was not 'in aid of any criminal proceeding' in part because it viewed the possibility of the caseworker visit leading to the discovery of fraud and a subsequent criminal prosecution as purely speculative.” (citing Wyman, 400 U.S. at 323, 91 S.Ct. 381)).
Moreover, as the dissent acknowledges, Wy-man expressly states that "if the visit should, by chance, lead to the discovery of fraud and a criminal prosecution should follow, then ... that is a routine and expected fact of life and a consequence no greater than that which necessarily ensues upon any other discovery by a citizen of criminal conduct.” Id. The dissent attempts to distinguish this case from Wyman by suggesting that "the County's program requires fraud investigators ... to detect and report evidence of welfare fraud and other crimes.” Dissent at 11532. This suggestion, however, simply does not square with the record. Project 100% does not affirmatively require that D.A. investigators look for evidence of welfare fraud or other crimes; rather, it is simply the duty of the investigators, as sworn peace officers, to report perceived evidence of unlawful activity. As Luis Aragon, the Chief of the D.A.'s Public Assistance Fraud Division, testified, the investigators are not tasked with "develop [ing] ... evidence ... that can be used in any other type of prosecution, but they’re also not deaf and dumb. If they observe or are made aware of a situation that causes them to be concerned that unlawful activity has occurred, I expect they will report it to whatever the appropriate source is.”

. We note that Wyman’s reasoning on the question of whether the home visits are searches under the Fourth Amendment arguably has been called into question by the Supreme Court's subsequent Fourth Amendment jurisprudence. The Court has since repeatedly held that consensual administrative searches qualify as searches under the Fourth Amendment, even though refusal to consent carried no criminal penalty and the searches were not part of a criminal investigation. See, e.g., Bd. of Educ. v. Earls, 536 U.S. 822, 833, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (holding that consensual random drug testing of students participating in extra-curricular activities were searches under the Fourth Amendment even though they were not part of a criminal investigation and a positive test resulted only in suspension from participation); Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (same); see also United States v. Gonzalez, 300 F.3d 1048 (9th Cir.2002) (holding that consensual suspicionless searches of government employees' personal belongings in the workplace were searches even though refusal to consent carried no criminal penalty and the searches were not for law enforcement purposes). Wyman, however, still controls this case because of its "direct application,” despite the reasoning of these later administrative search cases. See Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.” (quoting Rodriguez de Quijos v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989))); see also United States v. Hatter, 532 U.S. 557, 567, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001).

. Although we need not resolve the issue for Fourth Amendment purposes, nonetheless, addressing the "reasonableness” and "special needs” issues is helpful in analyzing Appellants' challenge under Article I § 13 of the California Constitution. While California’s constitutional analysis parallels the inquiry under the Fourth Amendment, see Part II.A, infra, the California Supreme Court, in its parallel analysis of the California Constitution, is not bound by the strictures of Agostini, 521 U.S. at 237, 117 S.Ct. 1997, as noted in footnote 8, supra.

. The Court also distinguished Wyman from its earlier decisions in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1741, 18 L.Ed.2d 930 (1967), where the petitioners had been criminally cited for refusing to consent to the war-rantless inspections of their home and commercial warehouse, conducted to ensure health and safety code compliance. While the Court struck down the warrantless inspections in those cases, it noted that they involved a true search for violations and refusal to consent to inspection carried criminal penalties, whereas in Wyman, refusal to consent resulted only in a denial of welfare benefits. Wyman, 400 U.S. at 324-25, 91 S.Ct. 381.

. This conclusion is further supported by subsequent Supreme Court decisions. For example, in Burger, the Court upheld the war-rantless inspection of a vehicle-dismantling business by uniformed police officers, reasoning:
[W]e fail to see any constitutional significance in the fact that police officers, rather than "administrative” agents, are permitted to conduct the [] inspection. The significance respondent alleges lies in the role of police officers as enforcers of the penal laws and in the officers' power to arrest for offenses other than violations of the administrative scheme. It is, however, important to note that state police officers, like those in New York, have numerous duties in addition to those associated with traditional police work.... So long as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals for violations other than those created by the scheme itself.
482 U.S. at 717, 107 S.Ct. 2636.

. The record shows that investigators would pass along evidence of criminal activity, such as drug use, child abuse, or even past welfare fraud, discovered during the course of a home visit. There is no evidence, however, that applicants have ever been prosecuted for welfare fraud as a result of inconsistencies discovered during the home visit, supporting a conclusion that the visits are intended, and in fact used, only as an eligibility verification tool. But the dissent "fail[s] to see why it follows from the lack of prosecutions for current or attempted welfare fraud that the home visits do not rise to the level of a traditional Fourth Amendment search.” Dissent at 936 n. 6. We need look no further than Wyman, however, to learn why the discovery of evidence of other crimes does not cause a home visit to rise to the level of a Fourth Amendment search:
If the visitation serves to discourage misrepresentation or fraud, such a byproduct of that visit does not impress upon the visit itself a dominant criminal investigative aspect. And if the visit should, by chance, lead to the discovery of fraud and a criminal prosecution should follow ... that is a routine and expected fact of life and a consequence no greater than that which necessarily ensues upon any other discovery by a citizen of criminal conduct.
Wyman, 400 U.S. at 323, 91 S.Ct. 381; see also Burger, 482 U.S. at 717, 107 S.Ct. 2636 (“So long as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals for violations other than those created by the scheme itself.”).

.In Wyman, the Court explained that any "burden” upon a homeowner’s right against unreasonable intrusion is minimized because "[f]orcible entry or entry under false pretenses or visitation outside working hours or snooping in the home are forbidden.” Wyman, 400 U.S. at 319-322, 91 S.Ct. at 387-88. While Appellants and the dissent, Dissent at 11533, argue that Project 100% allows "snooping” because investigators ask homeowners to open closets and drawers, we disagree. The Project 100% investigators only ask to view the contents of closets or drawers *925 for verification-related purposes, and will do so only with the homeowner’s explicit consent. For example, investigators may verify that children live in the home by asking to see children’s clothing. Similarly, if the applicant is a single mother, investigators may verify that no males live in the home by asking to see the contents of the medicine cabinet. Since the investigators have legitimate verification-related reasons for viewing such items not in plain view, and only do so with the homeowner’s explicit consent, their activity cannot fairly be characterized as "snooping.”

. The dissent quotes Kyllo v. United States, 533 U.S. 27, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) ("[T]he Fourth Amendment draws a firm line at the entrance to the house.”), to support its assertion that the County's home visits are unreasonable. Dissent at 943. Kyl-lo, however, is completely inapposite and has no application to this case. The dissent's extensive reliance on Kyllo here and elsewhere, see Dissent at 937, 939, 941, is misplaced because Kyllo involved a classic criminal law enforcement investigation conducted without the homeowner's consent. Likewise, the dissent's extensive reliance on Scott, see Dissent at 937-938, 939, 940, 941, 942 n. 13, is also misplaced. Scott expressly held that the scheme under examination there did not qualify under the special needs doctrine. See 450 F.3d at 872. Here, in contrast, the dissent ”agree[s] with the majority that the County has articulated a valid ‘special need’ beyond ordinary law enforcement concerns." Dissent at 939.

. Without citing any authority, the dissent asserts that a welfare applicant's consent to a home visit does nothing to reduce her expectation of privacy because ‘‘the coercive nature of the home visit renders the notion of consent effectively meaningless.” Dissent at 942. Wyman, however, addresses this very concern and reaches the opposite conclusion that even though the consequence of refusing a home visit is the denial of benefits, “[t]he choice is entirely [the applicant’s], and nothing of constitutional magnitude is involved.” Wyman, 400 U.S. at 325, 91 S.Ct. 381 (emphasis added).
In addition, this Court has recently observed that ‘‘government may sometimes condition benefits on waiver of Fourth Amendment rights — for instance, when dealing with contractors, or paying welfare benefits.” Scott, 450 F.3d at 867-68 (citing Wyman, 400 U.S. at 317-18, 91 S.Ct. 381) (emphasis added).

. In Samson v. California, - U.S. -, - n. 4, 126 S.Ct. 2193, 2201 n. 4, 165 L.Ed.2d 250 (2006), the Court recently noted that it has "sanctioned suspicionless searches in limited circumstances, namely programmatic and special needs searches.... ”

. In Brisendine, the California Supreme Court departed from the Supreme Court's Fourth Amendment standards, imposing broader limitations on searches incident to a lawful arrest. Brisendine, 119 Cal.Rptr. 315, 531 P.2d at 1111-15. In doing so, the court explained that "[i]n the search and seizure area our decisions have often comported with federal law, yet there has never been any question that this similarity was a matter of choice and not compulsion.” Id. at 1112.

. The Parrish court’s discussion of the reasonableness of the search and the voluntariness of consent raises serious doubts that the court relied on the California Constitution in finding that the searches were unreasonable. This is illustrated by the court’s express state-merits addressing the issue in the case as one under the Fourth Amendment without reference to the California Constitution and the court's analysis of the reasonableness of the search under United States Supreme Court precedent. See id.

. While MPP § 20-007.33 applies to for-cause home visits, the controlling statutory scheme also clearly provides for the creation of not-for-cause early fraud prevention programs such as Project 100%. See Cal. Welf. & Inst.Code § 11055.5. Accordingly, since the MPP has no parallel provision prohibiting "mass and indiscriminate’' home visits in the context of suspicionless home visits, we must assume that DSS intended to exclude situations such as this.