**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KATHLEEN M. WHALEN,
*Plaintiff-Appellant*,

v.

JOHN G. MCMULLEN,
individually and not in his
official capacity with the
Washington State Patrol,
*Defendant-Appellee.*

No. 17-35267

D.C. No.
2:15-cv-01625-BJR

OPINION

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, Senior District Judge, Presiding

Argued and Submitted June 5, 2018
Seattle, Washington

Filed October 30, 2018

Before: Jay S. Bybee and N. Randy Smith, Circuit Judges,
and John Antoon II,* District Judge.

Opinion by Judge Bybee

---

* The Honorable John Antoon II, United States District Judge for the Middle District of Florida, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed, on the basis of qualified immunity, the district court's summary judgment in favor of a Washington State Patrol officer in an action brought pursuant to 42 U.S.C. § 1983 alleging that the officer's entry into plaintiff's home without a warrant and under false pretenses violated her Fourth Amendment right to be free from unreasonable searches and seizures.

While investigating plaintiff for fraud related to her application for social security benefits, the officer as part of the Cooperative Disability Investigations Unit, gained both plaintiff's cooperation and entrance into her home by requesting her assistance in a fictitious criminal investigation. During the officer's investigation, the officer secretly videotaped plaintiff both outside and inside her home. No criminal charges were ever lodged against plaintiff, but the footage was used at her social security hearing.

The panel held that the officer's entry into plaintiff's home without consent or a warrant in the course of a civil fraud investigation related to plaintiff's disability benefits claim was an unreasonable search under the Fourth Amendment. The panel nevertheless held that the officer had qualified immunity from suit because the right to be free from a search in the context of a civil or administrative

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

investigation related to a determination of benefits had not been clearly established.

## COUNSEL

George Andre Fields (argued), Invictus Legal Services, Sacramento, California, for Plaintiff-Appellant.

Michael P. Lynch (argued), Assistant Attorney General; Robert W. Ferguson, Attorney General; Office of the Attorney General, Olympia, Washington; for Defendant-Appellee.

## OPINION

BYBEE, Circuit Judge:

While investigating Kathleen Whalen for fraud related to her application for social security benefits, Washington State Patrol officer John McMullen gained both her cooperation and entrance into her home by requesting her assistance in a fictitious criminal investigation. During his investigation, McMullen secretly videotaped Whalen both outside and inside her home. No criminal charges were ever lodged against Whalen, but the Washington Disability Determination Services division ("DDS") of the Washington Department of Social and Health Services ("DSHS") used at her social security hearing the footage surreptitiously filmed inside her home.

Whalen brought suit against McMullen under 42 U.S.C. § 1983, alleging that McMullen's entry into her home without

a warrant and under false pretenses violated her Fourth Amendment right to be free from unreasonable searches and seizures. She appeals a grant of summary judgment in favor of McMullen based on qualified immunity. We conclude that McMullen violated Whalen's Fourth and Fourteenth Amendment rights, but we agree with the district court that McMullen has qualified immunity from suit because the right was not clearly established. We affirm.

## I. THE FACTS AND PROCEEDINGS

In 2011, Kathleen Whalen applied for Social Security Disability and Supplemental Security Income benefits for cervical dystonia, a neurological disorder that causes tremors. DDS referred Whalen's application to the Cooperative Disability Investigations Unit ("CDIU"), a joint task force that investigates potential social security fraud,[1] for investigation due to "inconsistencies" between Whalen's allegations of severe functional impairments and her medical records. Whalen claimed difficulties with standing and walking, and she reported severe memory loss, weakness, and loss of motor skills. The referral to CDIU noted that Whalen's medical evidence did not support her reported diagnoses, including Parkinson's disorder, and that she appeared to use a wheelchair inconsistently. According to CDIU's report, the referral noted that Whalen's primary care physician prescribed her an electric wheelchair, "so there will be wheelchairs in the household," and asked for investigation of "how wheelchair accessible the house was, were the wheelchairs used, [were] clothes on them, etc."

---

[1] CDIU includes members from the Washington State Patrol, the Office of the Inspector General of the Social Security Administration ("SSA"), the SSA regional office, and DDS.

John McMullen is a detective with the Washington State Patrol who was, at the relevant time, detailed to CDIU. CDIU investigations may lead to criminal fraud prosecutions or to civil or administrative penalties. McMullen explained that from the outset, CDIU designates investigations as either criminal, civil, or administrative, and the CDIU team leader informs the assigned investigator of the designation when the case is assigned. He testified that criminal investigations are "approached differently"—CDIU does not seek warrants before conducting civil or administrative investigations, but it may seek warrants for criminal investigations. McMullen further testified that he believed that if evidence from a civil investigation triggered a criminal investigation, the evidence gathered during the civil investigation would be inadmissible as "fruits of the poisonous tree."

McMullen declared, "When conducting investigations, I do not enter a person's home in order to conduct a search of the residence. The purpose of my communication with any individual is to speak with and observe them in order to obtain information regarding their physical, mental and emotional faculties/responses." To do so, McMullen and other CDIU investigators commonly employ a ruse: they introduce themselves as law enforcement officers but conceal the purpose of their encounter from the benefits claimant. McMullen testified that CDIU investigators use this ruse to engage with the subject of their investigation "the majority of times" and that it is "[v]ery seldom" they do not. He also testified that he enters a claimant's home "a lot," estimating that he did so in "70, 80 percent" of the investigations. CDIU investigators conceal the purpose of the investigation to observe the subject's "functioning outside of the clinical and/or examination setting" while she is "not aware that . . . functioning [is] actually being scrutinized."

CDIU assigned Whalen's case to McMullen on October 11, 2012, and he visited her home that same day to observe her functional abilities. Because the investigation was not designated a criminal investigation, McMullen did not obtain a warrant. Wearing his state patrol badge, McMullen knocked on Whalen's door, and her mother answered. He identified himself as a detective with the Washington State Patrol. McMullen was equipped with two hidden cameras, which recorded video (but not audio) of the encounter. After Whalen came to the door, McMullen invited her to speak with him outside.[2] Whalen agreed and walked out to McMullen's truck. McMullen told Whalen that he was investigating a potential identity theft ring, but he assured her that she was neither under suspicion nor in danger of having her identity compromised. There was no identity theft investigation or case; rather, this was a typical "identity theft ruse" the officers use to engage subjects in conversation. An officer would tell the subject that he found her name and address "handwritten on a piece of paper" and was looking for further information. McMullen used the ruse to engage Whalen in conversation, asking her to complete a questionnaire and look through some photographs of "suspects." Whalen informed McMullen that she was, in fact, a recent victim of identity theft. McMullen stated in his declaration that he informed Whalen he was not investigating the theft of her identity. He designed the conversation and physical tasks, which included walking to the truck, writing, and turning over the photographs, "to observe her responses and bodily movements" in light of the referral's information

---

[2] McMullen testified that he generally prefers not to enter the home and explained that, in Whalen's case, "I wanted to have her perform physical tasks (including walking to my vehicle) in order to complete my observation."

about Whalen's medical claims. During the conversation, Whalen discussed her daily activities, which included occasionally driving or using an Access bus, shopping, cooking, and caring for her child and home. She also mentioned her recent application for a shipping, receiving, and stocking job on a loading dock.

The conversation then continued inside Whalen's home. According to McMullen, Whalen wanted to provide him with the contact information for the friend she suspected of committing identity theft, which she had on her cellphone. He stated that Whalen suggested going inside and that he entered the home "only to continue the conversation and not to conduct a search of Ms. Whalen's home." According to Whalen, after she thought she recognized one of the individuals in the photo array, McMullen requested the individual's contact information, which was inside on her cellphone. The parties agree that Whalen gave McMullen permission to enter her home. McMullen continued to speak with Whalen and her family inside the home for approximately fifteen minutes, during which time Whalen provided the contact information from her cellphone. He observed a wheelchair inside the home, which held folded blankets.

McMullen did not think a warrant was necessary to enter the home because he "was only going to Ms. Whalen's home to speak with and observe her" and "did not intend to search her home, or anything else, nor did [he] actually conduct a search of Ms. Whalen or her home." McMullen did not look through Whalen's "personal effects" or leave her presence; he "simply recorded what [he] was otherwise able to observe." The entire encounter lasted approximately one hour. Although one of the hidden cameras only captured the first

forty-five minutes of the interview, the other camera recorded the entire visit. At no time was Whalen aware that McMullen was videotaping her.

CDIU sent a summary report of McMullen's investigation to DDS for review and adjudication. The report focused on Whalen's abilities and comfort with walking, standing, sitting, reaching, and grasping, and it included McMullen's observations of Whalen's speech patterns, focus, finger dexterity, and writing ability. The report noted McMullen's observations inside Whalen's home, including that Whalen's wheelchair was "being used as a blanket holder," that "[t]he arms on the chair were not creased or indented from frequent use," and that "[i]t did not appear that the machine was used very often." According to the report, Whalen limped inconsistently and exhibited "no obvious pain related behaviors . . . unless she had a chance to think." "McMullen found her posturing to be very antiquated and [it] came across as an act. At no time during this investigation did [Whalen] ever exhibit any kind of debilitating behavior." CDIU reported that Whalen "was much more active than she alleged to SSA/DDS and her own personal medical care providers" and that "[n]either the medical records, nor the investigation found [her] to suffer from any significantly limiting mental or physical functional impairments."

DDS denied Whalen's benefits claims in part but determined that she did not commit fraud. The government never prosecuted Whalen for criminal fraud, nor did she face any civil or administrative action. She became aware of the surveillance tapes and McMullen's deception during the appeal of her denial of benefits.

Whalen filed this 42 U.S.C. § 1983 action for damages and injunctive relief against McMullen and DSHS. The parties filed cross-motions for summary judgment. The district court denied Whalen's motion and granted McMullen's motion, holding that McMullen was entitled to qualified immunity because as a matter of law it was not clearly established prior to this incident that McMullen's conduct amounted to a Fourth Amendment violation.[3] The district court dismissed Whalen's related state-law claims, declining to exercise supplemental jurisdiction. Whalen timely appealed.

## II.  FOURTH AMENDMENT ANALYSIS

Section 1983 provides a tort remedy for persons whose constitutional rights have been violated by state officials acting "under color of" law. 42 U.S.C. § 1983. The Supreme Court has held that public officials are immune from suit under § 1983 except where the violation should have been apparent to the official because the right at issue was "clearly established." *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985); *see also id.* at 526 (stating that qualified immunity is "immunity from suit rather than a mere defense to liability" (emphasis omitted)). Accordingly, qualified immunity protects officials who "routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them." *Davis v. Scherer*, 468 U.S. 183, 196 (1984). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

---

[3] The district court also granted summary judgment in favor of DSHS, finding that Whalen lacked standing. Whalen and DSHS stipulated to a voluntary dismissal of DSHS on appeal.

We analyze qualified immunity claims by determining "whether: (1) the facts adduced constitute the violation of a constitutional right; and (2) the constitutional right was clearly established at the time of the alleged violation." *Mitchell v. Washington*, 818 F.3d 436, 443 (9th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The question whether an action violated the Constitution is often a difficult one, and both district courts and courts of appeals are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

We review the questions of law at issue here *de novo*. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). Because of the important questions presented in this case, we address both prongs of the qualified immunity analysis. We first discuss whether McMullen's warrantless entry into Whalen's home under false pretenses was an unreasonable search under the Fourth Amendment, and we then turn to consideration of whether it was clearly established that such an entry was a Fourth Amendment violation.

## A. *Whether the Conduct Violated the Constitution*

We turn first to the question whether McMullen's actions violated Whalen's constitutional rights. Whalen does not contest the constitutionality of her encounter with McMullen at her door or outside her home—her Fourth Amendment claim is limited to McMullen's entry into her home and his observations of areas inside her home not visible from the threshold.

The Fourth Amendment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, instructs that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. "Without question, the home is accorded the full range of Fourth Amendment protections." *Lewis v. United States*, 385 U.S. 206, 211 (1966). Indeed, "'[a]t the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (citations omitted) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)); *see also United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008) (referring to the home as "the most constitutionally protected place on earth").

1. "Search" within the meaning of the Fourth Amendment

A Fourth Amendment "search" occurs when a government agent "obtains information by physically intruding on a constitutionally protected area," *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012), or infringes upon a "reasonable expectation of privacy," *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). As we have explained, following *Jones*, "when the government 'physically occupie[s] private property for the purpose of obtaining information,' a Fourth Amendment search occurs, regardless whether the intrusion violated any reasonable expectation of privacy. Only where the search *did not*

involve a physical trespass do courts need to consult *Katz*'s reasonable-expectation-of-privacy test." *Lyall v. City of L.A.*, 807 F.3d 1178, 1186 (9th Cir. 2015) (emphasis and alteration in original) (citations omitted) (quoting *Jones*, 565 U.S. at 404); *see also Florida v. Jardines*, 569 U.S. 1, 7 (2013) (holding that an "unlicensed physical intrusion" into the curtilage of a home was a search); *id.* at 12–15 (Kagan, J., concurring) (citing *Katz*, 389 U.S. at 360) (suggesting that an intrusion into the home is a Fourth Amendment search under either a property or privacy analysis); *United States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir. 2016).

McMullen entered Whalen's home with her permission, which he obtained after he identified himself as a law enforcement officer but misrepresented the purpose of his investigation. In a physical intrusion case like this one, whether a "search" occurred depends on whether the investigation (1) "took place in a constitutionally protected area" and (2) was "unlicensed" or without consent. *Jardines*, 569 U.S. at 7–8. Because the interior of a home is unquestionably a constitutionally protected area, our analysis is limited to the second question.

In determining whether a person consented to an intrusion into her home, we distinguish between "undercover" entries, where a person invites a government agent who is concealing that he is a government agent into her home, and "ruse" entries, where a known government agent misrepresents his purpose in seeking entry. *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990) (per curiam). The former does not violate the Fourth Amendment, as long as the undercover agent does not exceed the scope of his invitation while inside the home. *See Lewis*, 385 U.S. at 211; *United States v. Bramble*, 103 F.3d 1475, 1478 (9th Cir. 1996) ("It is well-

settled that undercover agents may misrepresent their identity to obtain consent to entry."). But "[a] ruse entry when the suspect is informed that the person seeking entry is a government agent but is misinformed as to the purpose for which the agent seeks entry cannot be justified by consent." *Bosse*, 898 F.2d at 115 (citing *United States v. Phillips*, 497 F.2d 1131, 1135 n.4 (9th Cir. 1974)) (disapproving of entry by officers who asked permission to investigate a fictitious robbery); *accord United States v. Little*, 753 F.2d 1420, 1438 (9th Cir. 1984) ("[A]ccess gained by a government agent, known to be such by the person with whom the agent is dealing, violates the [F]ourth [A]mendment's bar against unreasonable searches and seizures if such entry was acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation."); *SEC v. ESM Gov't Sec. Inc.*, 645 F.2d 310, 316 (5th Cir. 1981).

In this case, McMullen identified himself as a law enforcement officer and requested Whalen's assistance in a fictitious investigation, gaining entry into her home using this ruse. The concern we identified in *Bosse*—that the government would gain access to evidence "which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust"—is clearly implicated here. 898 F.2d at 115 (quoting *ESM Gov't Sec.*, 645 F.2d at 316). McMullen appealed to Whalen's trust in law enforcement and her sense of civic duty to assist him in his "identity theft" investigation. McMullen's description of an identity theft investigation was perfectly plausible, and Whalen readily agreed to cooperate. But there was no identify theft investigation underway. McMullen lied to Whalen about his real purpose—to investigate her for

possible social security fraud.    Whalen's consent to McMullen's entry into her home is vitiated by his deception.

McMullen argues that Whalen's consent to entry should nevertheless "be deemed valid" "because she testified at her deposition that she would have invited Detective McMullen into her home even if she had known he was there investigating her and not identity theft."[4]  But an answer to a

---

[4] At her deposition, Whalen testified:

> Q  And if Detective McMullen had asked you if he could videotape his conversation or interaction with you, would you [have] consented?
>
>      . . . .
>
> A I don't think so no.
>
> Q . . . Why is that?
>
> A If it was for the identity theft and we were just talking about that, then yeah, I probably would.
>
> Q But if he told you it was for investigating you, would you?
>
> A For me?
>
> Q Yeah.
>
> A Why not.
>
> Q Would you have invited him into your home, if you had know[n] that he was investigating you?
>
> A For my medical stuff and all that, yes; yeah, definitely.

hypothetical deposition question is not consent to a search, and it cannot cure the illegality of the search at issue. It is entirely immaterial that McMullen could have lawfully searched Whalen's home by securing her consent without using a ruse. His argument is akin to justifying a warrantless search on the ground that a warrant would have been issued if one had been sought. Regardless of whether Whalen would have consented to McMullen's entry into her home if he had not used a ruse, she did not validly consent here.

So far, this appears to be an "easy" case like *Jardines*, 569 U.S. at 11: a government agent entered into a home to gather evidence without license to do so because he gained "consent" using a ruse. But McMullen also argues that his entry into Whalen's home was not a "search" within the meaning of the Fourth Amendment because it was for a "civil investigation[] done to determine eligibility for government welfare benefits." He relies on two cases: *Wyman v. James*, 400 U.S. 309 (1971), and *Sanchez v. County of San Diego*, 464 F.3d 916 (9th Cir. 2006).

In *Wyman*, the Supreme Court upheld warrantless home visits by caseworkers as a condition of receiving benefits from New York's Aid to Families with Dependent Children program ("AFDC"). 400 U.S. 309. Under New York law, public assistance to families with minor children required periodic home visits to ensure that the child's "physical, mental and moral well-being [was being] safeguarded" and that "the welfare of the child [was] not endangered." *Id.* at 312 n.4 (quoting N.Y. Comp. Codes R. & Regs. tit. 18, § 369.2). There was no criminal penalty for refusing the home visits, which could be scheduled in advance, *id.* at 320–21, but if a beneficiary did not consent, the visit would not occur and welfare benefits would be denied or

discontinued, *id.* at 317–18. The Court reached alternative conclusions. First, it concluded that the visits did not rise to the level of a "search in the traditional criminal law context," noting that the visits were "not forced or compelled." *Id.* at 317. Second, the Court held that even if the caseworker's visit was considered "a search in the traditional sense," the visit was not unreasonable and therefore did not violate the Fourth Amendment. *Id.* at 318. The Court explained in some detail why AFDC's home visits were not unreasonable searches. Among other things, it emphasized that AFDC scheduled the visits in advance at a time convenient to the recipient, *id.* at 320–21; the visits were conducted by non-uniformed personnel—a caseworker who "is not a sleuth but rather . . . a friend to one in need," *id.* at 322–23; and the visit was not a criminal investigation, although there was always a possibility of discovering evidence of a crime, which is a "routine and expected fact of life," *id.* at 323. The Court concluded that the home visit was "a reasonable administrative tool" and "not an unwarranted invasion of personal privacy." *Id.* at 326.

Thirty-five years later, we addressed a similar issue in *Sanchez*, 464 F.3d 916. Under California's welfare program, applicants must submit to a visit from the Public Assistance Fraud Division ("PAFD") of the district attorney's office to verify that there is an eligible child in the household and that an "absent" parent does not live in the home. *Id.* at 919. Although the PAFD did not tell the applicants the exact date and time, it would advise them generally of the visit, which typically lasted fifteen minutes to one hour and included an applicant-led "walk through" of the premises. *Id.* at 918–19. Closely following *Wyman*, we reached two conclusions. First, we held that these visits were not searches within the meaning of the Fourth Amendment. *Id.* at 920–23. *But see*

*id.* at 922 n.8 (noting that "*Wyman*'s reasoning on the question of whether the home visits are searches under the Fourth Amendment arguably has been called into question by the Supreme Court's subsequent Fourth Amendment jurisprudence" but holding that *Wyman* was controlling because of its "direct application" (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997))). We noted that "[a]s in *Wyman*, the home visits are conducted with the applicant's consent, and if consent is denied, the visit will not occur," and "there is no penalty for refusing to consent to the home visit, other than denial of benefits." *Id.* at 921. Alternatively we held that even if the visits constituted searches, they were reasonable. "[B]ecause the [home] visits serve an important governmental interest, are not criminal investigations, occur with advance notice and the applicant's consent, and alleviate the serious administrative difficulties associated with welfare eligibility verification, we hold that the home visits are reasonable under the Supreme Court's decision in *Wyman*." *Id.* at 925.

*Wyman* and *Sanchez* do not support the ruse visits conducted by CDIU. In those cases, there was no "search" of a home within the meaning of the Fourth Amendment because (1) there was no physical intrusion into the home without the homeowner's consent, and (2) the visits were a condition of eligibility for benefits. *Wyman*, 400 U.S. at 317–18; *Sanchez*, 464 F.3d at 920–23; *cf. Jardines*, 569 U.S. at 7–10 (considering officers' purpose for entering a constitutionally protected area without an express invitation to determine whether conduct complied with an implied license or was an unlicensed "search"). The home visits were transparent: both sides knew what was at stake and why the caseworker or investigator was in the home.

The present case is distinguishable on both grounds. Benefits applicants and beneficiaries in *Wyman* and *Sanchez* were informed that a home visit was a condition of receiving benefits, and they were given the option to consent or refuse entry. The claimant in this case was given no notice that a home visit would be conducted in connection with her benefits claim, because a home visit is not a condition of receiving benefits. She had no opportunity to consent to or refuse the visit. Of course, as McMullen testified, the subject of an investigation could refuse to speak with him or refuse him entry at the door. But in that scenario, the subject would believe she was refusing to assist a law enforcement officer in the investigation of a crime. She would have no idea of any connection to or potential effect on her application for benefits.

Once we add to this the fact that McMullen videotaped his entire visit, any illusion that this was not a Fourth Amendment search evaporates. McMullen had two cameras running while he was talking with Whalen, and at least one of the cameras captured his entire visit inside her home. Of course it was a search: not only was McMullen there to observe Whalen, but he had also been asked specifically to seek evidence concerning Whalen's use of an electric wheelchair, "how wheelchair accessible the house was, were the wheelchairs used, [were] clothes on them, etc." McMullen's report faithfully fulfilled his charge from CDIU. He reported that the wheelchair was "being used as a blanket holder" and that "[t]he arms on the chair were not creased or indented from frequent use." This evidence could only have been obtained inside Whalen's house, and McMullen secured it through an unconsented, warrantless search.

As for the purpose, while the visits in *Wyman* and *Sanchez* were "both rehabilitative and investigative" in nature, *Wyman*, 400 U.S. at 317, and involved "looking for inconsistencies between the prospective beneficiary's application and her actual living conditions," their "underlying purpose" was "the determination of welfare eligibility," *Sanchez*, 464 F.3d at 921–22. In *Sanchez*, PAFD required "all" welfare applicants who were "*not* suspected of fraud or ineligibility" to undergo a home visit. *Id.* at 918 (emphasis added). Although the investigators were "required to report evidence of potential criminal wrongdoing"—including welfare fraud—"for further investigation and prosecution," the home visits were not fraud investigations. *Id.* at 919. CDIU's "primary responsibility," on the other hand, "is to investigate allegations of fraud in SSA's disability programs for purposes of criminal prosecution and/or civil/administrative action." CDIU does not investigate all benefits applicants—only those whose claims have been referred by DDS for "suspected fraud." The Washington State Patrol officers assigned to CDIU, who conduct the investigations, have law-enforcement powers, and their duties and responsibilities include "[u]sing their existing arrest authority granted under the laws of Washington." While CDIU reports the investigation results to DDS "to facilitate timely and accurate disability eligibility determinations," CDIU itself is prohibited from "making recommendations and providing opinions . . . regarding disability eligibility." Even though CDIU investigations may not lead to criminal prosecution and other agencies may use the investigations to determine benefits eligibility, this situation is materially different from those in *Wyman* and *Sanchez*, in which home visits were an express condition of receiving benefits for all applicants.

McMullen's declarations that he "do[es] not enter a person's home in order to conduct a search of the residence," but rather "to obtain information regarding their physical, mental and emotional faculties/responses," and that he did not "actually conduct a search of Ms. Whalen or her home," does not alter this analysis. McMullen's purpose was to gather evidence for the fraud investigation, which he did by making observations and video recordings of Whalen and her home. Because he entered the home while using a ruse and not while undercover, it is immaterial that he stayed within Whalen's presence in the home and did not conduct a broader search. He did not have consent to be in the home for the purposes of his visit. *See Bosse*, 898 F.2d at 115; *Little*, 753 F.2d at 1438. And he did not have consent—under any terms—to videotape Whalen or her home. By observing and videotaping Whalen inside her home without her consent, McMullen conducted a "search" within the meaning of the Fourth Amendment. *Jardines*, 569 U.S. at 6 ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); *cf. Craighead*, 539 F.3d at 1077 ("The home occupies a special place in the pantheon of constitutional rights.").

### 2.  Reasonableness

"[W]hether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652–53 (1995) (citations and internal quotation marks omitted). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (citations and internal quotation marks omitted).

a. Reasonableness under *Wyman* and *Sanchez*

As in *Wyman* and *Sanchez*, CDIU investigations serve the important interest of preventing benefits fraud and may aid in the verification of a claimant's eligibility for benefits. But they differ in other material respects. Because the home visits at issue in *Wyman* and *Sanchez* were required for every welfare applicant, "a warrant requirement would pose serious administrative difficulties." *Sanchez*, 464 F.3d at 924–25. If no probable cause existed that an applicant had violated a law, no warrant could be obtained for a home visit for that applicant. Where "a warrant could be obtained, it presumably could be applied for *ex parte*, its execution would require no notice, it would justify entry by force, and its hours for execution would not be so limited as those prescribed for home visitation." *Id.* at 925 (internal quotation marks omitted) (quoting *Wyman*, 400 U.S. at 323–24). A warrant requirement would accordingly "make home visits more intrusive than the . . . suspicionless home visit program[s] because welfare applicants' rights and privacy would be subject to greater infringement." *Id.*

As discussed above, CDIU investigates only those claimants suspected of fraud, and the investigations are done on the understanding that if fraud is discovered, there may be civil or criminal consequences. Given that CDIU purportedly obtains warrants in some investigations, a warrant requirement would not appear to present the same administrative difficulties in this context. Most importantly, there is neither notice nor consent to CDIU searches. At least in the case before us, entry was, in fact, made under false pretenses. Weighing these factors against the significant privacy and property interests implicated by a search of one's

home, we cannot conclude that the CDIU ruse investigation in this case was reasonable under *Wyman* or *Sanchez*.

> b.  Reasonableness under the "special needs" warrant exception

McMullen also argues the "special needs" exception may apply to this civil investigation. There is a "special needs" exception to the warrant requirement for administrative searches, such as searches of probationers' homes, drug testing in public schools, and inspections of regulated businesses. *See Griffin v. Wisconsin*, 483 U.S. 868, 873–74 (1987); *Vernonia Sch. Dist. 47J*, 515 U.S. at 652–53. To determine whether a warrantless search falls within the "special needs" exception, we "(1) determin[e] whether the government has articulated a valid 'special need;' and, (2) analyz[e] whether the proposed administrative search is justified in light of that articulated 'special need.'" *Sanchez*, 464 F.3d at 925.

A "special need" must be "beyond the normal need for law enforcement," *Griffin*, 483 U.S. at 873 (internal quotation marks and citation omitted), and thus a valid "special need" for an administrative search must be distinguished from general law enforcement purposes. *Veronia Sch. Dist. 47J*, 515 U.S. at 653. CDIU internally distinguishes between those investigations that are for potential criminal prosecution and those in which only civil or administrative penalties may be sought, even though the nature of an investigation can change. It is not disputed in this case that McMullen's warrantless entry into Whalen's home would have been an unreasonable search had this been a criminal investigation. But Fourth Amendment protections apply in civil investigations as well as criminal investigations, and the

Supreme Court has expressly rejected a distinction between the two for purposes of Fourth Amendment protection. *Camara v. Mun. Court of S.F.*, 387 U.S. 523, 530–34 (1967) (holding that, in the absence of an emergency, an administrative search of a residence under a fire, health, or housing code enforceable by criminal penalties is a Fourth Amendment "search" requiring consent or a warrant). *But see Wyman*, 400 U.S. at 324–25 (distinguishing *Camara* and related cases on the ground that refusing to consent to a search led to criminal prosecution rather than the denial of benefits). We are not convinced it is appropriate to distinguish between CDIU's civil and criminal fraud investigations, but we would find the search in the civil investigation in this case unreasonable even under a special needs analysis.

As discussed above, CDIU searches, unlike the home visits in *Sanchez*, are done specifically to investigate claimants suspected of fraud, not as a general condition of receiving benefits. *See Sanchez*, 464 F.3d at 926 (noting that "[w]hile there may be a fine line between verifying eligibility and investigating fraud, the record here supports that the visits are indeed used primarily for verification and prevention purposes," and that no home visit had ever resulted in a criminal prosecution for welfare fraud); *see also Ferguson v. City of Charleston*, 532 U.S. 67, 81 (2001) (holding that drug testing was not justified under the "special needs" doctrine where "the purpose actually served by the . . . searches is ultimately indistinguishable from the general interest in crime control" (internal quotation marks omitted)). Even where CDIU investigations are for potential civil penalties or ultimately result only in an advance adjudication of a benefits claim, they primarily serve the purpose of policing the social security eligibility rules. CDIU does not

investigate all social security claimants, only those claimants that CDIU suspects of fraud. McMullen searched Whalen's home without a warrant to gather evidence for an investigation of her potentially fraudulent application for benefits. Thus, even if this was an "administrative" search, it served general law enforcement purposes and not a "special need."

\* \* \*

For the foregoing reasons, we conclude that McMullen's entry into Whalen's home without consent or a warrant in the course of a CDIU civil fraud investigation related to Whalen's benefits claim was an unreasonable search under the Fourth Amendment.

B.  *Whether the Violation Was "Clearly Established"*

This conclusion does not end our inquiry. To hold McMullen personally liable under § 1983, Whalen's right to be free from a search in this context must have been clearly established. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. "The dispositive inquiry is 'whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *CarePartners, LLC v. Lashway*, 545 F.3d 867, 883 (9th Cir. 2008) (alteration in original) (quoting *Saucier*, 533 U.S. at 202). The Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (citation omitted). "Qualified immunity is no immunity at all if 'clearly established' law

can simply be defined as the right to be free from unreasonable searches and seizures." *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1776 (2015).

Although we conclude that McMullen's warrantless ruse-entry into Whalen's home was an unreasonable search, we cannot say it was clearly established that his conduct, in the context of a civil or administrative investigation related to a determination of benefits eligibility, was a search or was unreasonable. Whalen does not have to identify a controlling case finding a constitutional violation on the exact facts of her case for her asserted right to be clearly established, but she relies only on *Bosse* and other criminal ruse entry cases. In light of *Wyman* and *Sanchez*, *Bosse* would not have provided McMullen with notice that his actions—which were common practice for CDIU investigators—violated the Fourth Amendment. McMullen knew he was conducting a civil investigation, not a criminal investigation, and that it was related to Whalen's eligibility for social security benefits. Additionally, McMullen did not initially seek to enter Whalen's home but rather to engage her in front of her house; Whalen limited her constitutional challenge to McMullen's actions once he crossed the threshold. As the district court noted, there was no authority "requiring McMullen to retreat from [Whalen's] home" as the conversation moved inside, nor was there authority "clearly proscribing McMullen's conduct in this situation." We agree that it would not have been clear to a reasonable officer that his conduct, in the context of this civil investigation related to a determination of benefits eligibility, was unlawful. The right Whalen asserts was not clearly established, and McMullen is entitled to qualified immunity from this suit.

## III.  STATE CLAIMS

After holding that McMullen was entitled to qualified immunity on Whalen's federal claim, the district court declined to exercise supplemental jurisdiction over Whalen's related state-law claims.  This was not an abuse of discretion. *See* 28 U.S.C. § 1367(c)(3).

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.